Your Honor, this is the last case of the morning call, Steven Peterson v. Village of Oakbrook at all, on behalf of the F1, Steven Peterson, Mr. Charles DeBase, excuse me, it's Merrick Cummins, I'm sorry, and on behalf of the Village, Mr. DeBase. We've been having trouble with identifications today. We apologize. It must be Thanksgiving. And thank you, officer, for closing the door. I appreciate that. All right, Ms. Cummins, if you're ready, you may proceed. Thank you. Good morning, Your Honors, counsel, and may it please the court. As your employer, we are here before you on our appeal of an administrative decision by the Village of Oakbrook Police Board terminating Steven Peterson. We are appealing that decision as well as the circuit court's decision affirming that decision. But before I get to the administrative decisions, and I say decisions because there were two, I first want to address what I think were errors committed by the court in this matter. And it is our opinion that these errors resulted in Steven Peterson being denied a fair hearing as due process requires. Excuse me. The first error we assert is when the court denied our motion to remand or reopen the matter after the discovery of new evidence, that the ability to remand the case is within the discretion of the court, as you're aware. So we are here on an abuse of discretion standard. And it's our opinion that the court abused its discretion by not remanding or at least reopening the record. The newly discovered evidence that we're discussing consisted of essentially the testimony via affidavit of a deputy chief who had, after the case was terminated, after the chief had resigned, after the deputy chief had retired, this person on his own volition came forward with evidence that he thought demonstrated, first of all, injustice towards Mr. Peterson, but secondly, potentially improper conduct by one of the defendants. The evidence consisted of one apparent meeting that took place between the chief and the head of the police commission, two apparent interviews of witnesses which were favorable to Steve Peterson, which were destroyed or at the minimum concealed. And those were with Illinois State Police? Yeah, apparently lieutenants from the department had interviewed certain state police members, yes. Right, but now how is this new? Because your client knew the Illinois State Police officers and who they were. So how was the information coming, let's say, forehand here, new information and not information that your client had? The difference is this, we did have the state police reports and those state police officers were investigating Drew Peterson and his potential involvement in the disappearance of his wife. What we're talking about here was a departmental investigation where lieutenants of the department were interviewing these state police officers apparently to find out about Steve's cooperation with them, working with them and whatnot. And apparently he went so far as to not only silence the lieutenants, but hide whatever their statements were and hire some sort of private investigator, which we don't know who that person is. So in that sense, it's new. And secondly, the third part of the evidence was the communications between the chief and the deputy chief, which were inflammatory, demonstrated bias against Steve Peterson. Those are frankly the lesser of our concerns of the evidence. And do we not have to know how that would impact the board's decision? Yes. Here's the problem, Your Honor. This is not just a matter of new evidence. Everyone knows that defendants had an obligation to truthfully and completely answer our discovery requests, regardless of whether the answers were to their favor or not. The problem is we're talking about hidden and concealed evidence. And we were faced with the almost untamable burden of determining more specifics about that evidence because we were not allowed by the court to proceed with depositions and whatnot to determine more information about those witnesses. So we were sort of caught between a proverbial rock and a hard place. On the one hand, there was a dispute about the deputy chief's position because after he retired, he came back to the department in some capacity where I was being told that we weren't allowed to talk to him, that it was improper to talk to him and whatnot. So on the one hand, we couldn't ascertain more information from the key person, the key person who came forward voluntarily with this information. Now, on the other hand, we're told, well, you haven't met the court's burden. You haven't shown us what this evidence is. And under circumstances, because of the nature of this, this isn't just, again, this isn't just new evidence. This is stuff that apparently was hidden. To expect a plaintiff to bear the burden of uncovering it is, I think, unreasonable in this situation. There's no way that we could have gotten this information prior to the deputy chief coming forward. There's no way. He was- Well, except interviewing the Illinois state police officers. Well, we could have. We did talk to the state police officers, but it was not the nature of their investigation had to do with Drew Peterson. This has to do with the allegations about Steve and what Steve did or didn't do. And apparently, that was the purpose of the chief's interview with the state police officers. That was the purpose of the chief's hiring of a private investigator to specifically inquire about Steve's conduct. And, again, these were witnesses that had information beyond what we got in discovery. What we got in discovery was a stack of police reports about the investigation into Drew Peterson. The purpose of those documentation was not to- The purpose of those documents were not to strictly evaluate Steve Peterson with respect to the criminal matter. So it's a completely different issue, really. But couldn't you have asked them when you interviewed them if they'd been interviewed by anyone else, if they had given statements to anyone else? That doesn't seem like a difficult burden. We could have, yes. But remember, this all came through lieutenants of the police department. And we're talking about triple hearsay here, where you have a deputy chief who knew of lieutenants, who interviewed the state police officers. We didn't have access to either the deputy chief or the lieutenants because of their position. Your position is that Oak Brook interviewed the state police officers. You also interviewed the state police officers. Some of them, yes. Yes. And at any time, could you not have asked them, were you interviewed by anyone else? Sure. And, therefore, have uncovered that, you know what, there's got to be other reports out here. Sure. That's a possibility, yes. But, again- But doesn't that go to what Justice Zenoff brought up, that how is this new evidence, if it was out there and you, with a question or two, could have uncovered it? Well, again, it goes to this concealment issue. I don't mean to repeat myself, but, you know, there's a lot we fully expected to get complete statements, complete evidence when we asked for it. Typically, you don't interview each and every person who's named in a police report, particularly when you have hundreds and hundreds of pages of documents. So when we specifically asked for people with knowledge of certain things, that should have been revealed to us. The burden was on them to reveal that to us, not for us to go on a fishing expedition of every person named in the police report to find out if there were any other interviews out there that somebody might have hidden or destroyed. I think that's a little bit more of a burden that should be placed on the petitioner in this matter. In addition to the allegations here, they're pretty specific. Knowingly resists or obstructs the performance of one known to be a police officer, peace officer, shall not interfere with cases being handled. Those and state troopers had come to talk to him during the period of time. Correct. So, you know, I guess I would look at this and say, did my client do anything to impede your investigation? Correct. And I guess what you're going to say or what we are to kind of infer is the answer would be no, he was pretty cooperative. Right. And that could, I suppose, have helped, you know, your disposition here. But I guess I would go down the list of allegations and say, did he ever do this, notwithstanding what the village did or didn't give you? But that was not done? Well, remember, the only witness that the defendant, I mean, the village had the burden for their case. The state police officer that they called said adamantly that he was cooperative and not obstructive. So, really, to go beyond him wasn't necessary in our opinion, which goes to my argument about the manifest way of the evidence and whether or not either decision should be upheld to begin with. But before we get there, how is this material? How is the information from Larson's material? I mean, it doesn't change the acts that your client did? The one piece of information, in fact, as he testified, the chief met with the head of the police commission during the proceedings. That's completely inappropriate. He's entitled to an impartial hearing, and there's case law that I've cited that says essentially if the chief interacts with one board member, that board member is infected and the entire police board is infected.  And again, without knowing, if you're going to hide a statement or destroy a statement as alleged, we have to assume that that statement is going to be favorable or even exculpatory. So, clearly, that would be relevant to whether or not the police board's findings were substantiated. And with respect to the bias and the statements by the chief that were made to Deputy Chief Larson that he didn't feel privy to reveal before his retirement, you know, this case seemed to hinge at least somewhat on credibility. So I would suspect that statements made by the chief to Deputy Chief Larson of such an inflammatory nature, as you saw in the record, would assume in a fair police board, would have impacted the police board's opinion on whether or not the chief was credible and what the chief's motives were in bringing the case in the first place. And the second, so the denial of the motion to remand under the circumstances, I think, was an abuse of discretion and denied Steve a fair hearing. The second problem was when after the defendants and the police board had the benefit of seeing the briefs, of hearing oral arguments, of basically writing a second decision. Because at that point, the court determined, yes, it is appropriate. I want to remand this to give the board a chance to sufficiently explain the termination. I understand that the court has the right to remand cases in certain circumstances. Essentially, what the court did was give them a chance to rewrite the decision. I mean, the entire decision was supposed to say why termination was justified. So the court basically said, so now explain why you did it, when they should have done it in the first place. And with respect to the new construction of the board, I conceded in my brief, as I do before you, that the law doesn't always require all board members to be present for a hearing to render a decision. The law may require it when credibility is an issue. And the first police board specifically said, described Steve Peterson as, I think his testimony was self-serving and not credible, but never explained why. Those are nice code words. You know, everybody who does this type of law knows that credibility determinations are not easily overturned. So it's very easy to say this witness was not credible. But why? They didn't point to one instance where he was inconsistent, impeachment, nothing about his demeanor. So here we have a new board that did not see or hear the evidence, except for one, and had nothing to substantiate the credibility findings in the first place. But yet they not only accepted those findings, but expanded upon them because they were given the chance to do so. Each of them reviewed the material that was induced at the hearing, the evidence that was induced at the hearing. So it wasn't as if they didn't look at the evidence. That's correct. But I think a big part of that is seeing the witnesses, at least when it comes to credibility, and they didn't do that. And we're supposed, and the police board didn't, the first board didn't substantiate their credibility findings. And even if we were to assume that the remaining board member discussed this with them behind closed doors, because we don't know specifically how they discussed the matter before they rendered a second decision, even if this one remaining board member did discuss this with the new board, we still have the problem of the infected board. The chief met with the board member in the first case. The law says that infects the entire board. So the only remaining board member was part of an infected bias board, and that's the only person that this new board was relying on in rendering a second decision. And the whole thing was just one error after another, when it could have simply been handled by allowing Steve the opportunity to reduce the additional evidence that we were told was out there. Instead, we have a convoluted second decision, which was predominantly weighed in upon by a board member who was part of the first apparently infected proceedings. What part, if any, did the newly constituted board have on the trial court's decision not to allow more evidence? Was that ever mentioned? No. The motion to open for more evidence came first, and that was denied. And then we briefed the matter, we argued the matter, and then the judge issued his decision saying, basically, I'm demanding this to the board to sufficiently explain the basis for terminating Steve Peter. So at the time you wanted to go back to the board, was the board still pretty well intact? I believe so, but my point is that wouldn't have mattered, because if we were allowed to bring forth new evidence, whoever was on the board would have been there to hear and see it firsthand. So for those reasons, you may address. We started a little early, so you have some time to address the other issues. Just quickly, putting aside the due process issues that I think were raised by the decisions of this report, just briefly, with respect to the actually administrative review part of the decision, I understand it's a deferential standard. It's whether or not the findings were against the manifest way of the evidence. And my position and our position is that even if you were to completely defer to the police board and accept all their findings, both decisions to be true, there was no evidence of obstruction. And the obstruction finding is what was the basis of every rule violation. There is no testimony or evidence that anything Steve did or didn't do in those four days interfered with, thwarted, I think was a word used, or obstructed with the police investigation. And their only police witness didn't say that. He said that Steve cooperated. And in addition, there was evidence that Steve was interviewed five times by them voluntarily. He allowed searches of his house. He testified for the state, for goodness sake, against his father twice. So there's no evidence of obstruction, even assuming every single fact to be as the defendant stated. And finally, cause for discharge has been well defined as some substantial shortcoming which renders an employee's continued employment detrimental to the efficiency and the discipline of the service. The bottom line is this happened in 2007, in November, over a period of a few days. And if, in fact, something that Steve Peterson did in 2007, or did do in 2007, somehow constituted a substantial shortcoming, how was it that he was able to continue for another three years as a police officer? This case was not brought forth by the chief for three years. And in that time period, not only did he perform and serve the public and his department, he did so with distinction, as I addressed in my brief when I cite two different parts of his performance evaluations and whatnot. They were asked, though, to not bring it for, I believe, the state's attorney, correct? That's correct. So that's the reason that, for the time. And I think you indicate at one point in your brief that your client's service was exemplary. But nevertheless, there are disciplinary actions that were taken against him even before the events with regard to his father, correct? Yes. Two points, Your Honor, if I may. Regardless of the reason for the delay, I've been doing this a long time. If the department was concerned about Steve's an officer or his interaction with the public, they could have put him on administrative leave. They could have put him on desk duty. They could have done a lot of things. Obviously, they could have had him watched. They could have had him trained. They could have had him ride along with somebody. They let him go forward as an officer for three more years. And, yes, he had some discipline. And I don't want to go into the stuff related to the dad, as I call it. But it was not severe. And it certainly is not the kind of backdrop that would warrant a termination under the circumstance. Did any of those disciplines occur after the 2007 period of time we're talking about? Or were most of them beforehand? In 2007 was when the Steve Peterson matter hit the media. And then the two most significant incidents occurred right after that, when Steve took his police car to the grand jury. And one other, the leave violation, which arguably it was a suspension. It wasn't a huge suspension. But those I would call the two more serious violations. Other than that, there was some discipline after, but it was minor reprimands of that nature. Unless you have other questions? Thank you. You'll have an opportunity for a rebuttal. Thanks. Mr. Herbas. May it please the court. Charles Herbas on behalf of all the appellees. Judge Sheen, in his opinion, upholding the board's decision, made the following comment that I think is particularly appropriate and represents the position of the appellees. Officer Peterson's actions in regards to the guns and the money, as described above, thwarted law enforcement's efforts to locate Stacy Peterson. And it raised serious questions about Officer Peterson's honesty and integrity. At the time, counsel, Stephen did not know the nature of the investigation of the state police. At the time, he was asked to take the guns. And at the time, his father gave him the money. So if he didn't know what was going on, then how is his conduct sanctionable? Let me, if I can, note some very important facts. If we go with the Monday through Friday, Monday was the day that Stacy Peterson was declared missing and there was a missing persons report filed. And the record shows that Drew Peterson called his son and said that Stacy had left. So he knew, Steve Peterson knew, that Stacy Peterson had left or was gone or was missing. That was on October 29th? That was on October 29th. That was Monday. On Tuesday in the morning, on October 30th, Steve Peterson received a call from his father in which his father said, I'm going to bring three guns over to your house. All right. And the record is very clear here. Steve Peterson admitted in the record that his father gave him three guns because he did not want police to find them. That's in the record at 364 and 366. I thought there was also something about he didn't want them damaged. That is something that Steve Peterson testified that that is, that he gave that as a reason in explaining it. However, he was very clear that his father did not want the police to locate those guns, to find those guns. And so on that Tuesday, he received the guns and $236,800 in checks. And then on Wednesday, Steve Peterson admitted at the hearing that that the media had camped out at his father's house. So, you know, this this circus media was was all set to go. We all kind of remember what was going on at that point in time. And Steve Peterson said that that definitely was happening by Wednesday. On Thursday, the state police are searching the home. And the record shows that Drew Peterson called his son and said, yeah, the police are here. They're searching the home. Go ahead and cash the checks. And then during the search, the police located ammunition for a gun that was not there was the AR-15. They asked Drew Peterson, where is the gun? And that's when Drew Peterson admitted that he had brought the gun to his son's house. And then the state police contacted Steve Peterson and said, we understand that you have some guns. And Steve Peterson admitted that he had the weapons. The point that we are making here is not that Steve Peterson wasn't cooperative with the state police after they had contacted him. It was the fact that Steve Peterson knew that he was hiding guns at the request of his father. It's also very important to understand that Sergeant Lawson testified at the hearing that Steve Peterson admitted that Drew said he thought he might get arrested. So so so just as the idea that Steve Peterson had no idea why his father was giving him guns and money. I think that the record clearly shows that he had a real good idea of what was going on. He may not have known what happened to Stacy Peterson, but clearly there was a problem. There was a missing woman and nobody knew where she was. And and his father was concerned that he was going to be arrested. So I think that I think it is would be a stretch to say that Steve Peterson, a law enforcement officer, was not keenly aware that there was a serious problem here with Stacy's disappearance. When the officers came for the guns, was there any conversation about anything else that Steve might have? The there were the record shows that the state police went to Steve Peterson's home and talked to him. And at that time, he asked if they could meet later and he would deliver the guns to them. And Sergeant Lawson said that he was OK with that, given that Steve Peterson was a fellow law enforcement officer. He trusted that he would do it. Then when they got to the station at Bolingbrook later that day, Steve Peterson turned over the guns. He was questioned. The state police did a report on what was the discussion on that. And he clearly was asked at the end of the discussion or the questioning, is there any other information that you have that might be relevant or helpful to us? And that's when Steve Peterson did not disclose that his father had given him the two hundred and thirty six thousand eight hundred dollars in checks, which we learned in the record from Steve Peterson's testimony. His father had given him in case he needed to take care of the children in some way. Did I mean, is there anything during this period of this relevant period of time that indicated that Steve Peterson knew that the monies given to him somehow were also related to Stacy Peterson? I mean, did the checks say Drew Peterson and Stacy Peterson? Was it a blank check? What was it? Actually, I don't know the answer to that question. We never actually got copies of the documents from the investigation from the state's attorney's office. So I've actually never seen the checks. All we have is the admission by Steve Peterson that he received several checks. And one of those was a very large one that was based on a home equity loan. And so did he know that? Did he know that was the issue that I think you tried to raise in the brief was that this money came from an account of both Stacy and Drew and Stacy being on the account causes a problem. Did he know that Stacy had anything to do with this money or did he just believe it was coming from his father for the care of his younger siblings? The record, the record is not clear on that. And all we have in the record is what Steve Peterson admitted. And he only admitted that he believed it was from his father to take care of the children. And so Sergeant Lawson, if you look at the record carefully, Sergeant Lawson had a problem with that explanation. He said that the issue he was concerned about is that Drew Peterson would be giving him money and then later come back and say, I want my money back for whatever reason. So it was a way of hiding assets in some way is what the implication is from Sergeant Lawson's testimony, which is why Sergeant Lawson said, I felt it was important that he disclosed that. And he should have told his staff that was important to the investigation. That was the sergeant's testimony for the state police. If I may, I do want to address the issue of the reopening of the record. And I certainly have something else to say with respect to the termination, but I want to make sure I don't, that I address this. Number one, clearly it's in the sound discretion of the trial court whether to reopen the record or not. And that's a pretty high standard in terms of abuse of discretion. But there really is no factual basis to suggest that any sort of document or evidence was hidden in any way. They had all the reports. They had the grand jury testimony. The record shows that that was disclosed on September 30th, 2010, months before the hearing. And then what we had was, and this is really important, we had a last minute discovery request from the attorney saying, and this was the Wednesday before Thanksgiving of 2010. And that occurred with a tell me whatever documents you have, which is very typical that happens in these police board hearings. You want to cover your bases and say, hey, I want to make sure I lay some paper. It says make sure I have everything that I'm supposed to have. Now, this hearing is supposed to start on Tuesday. So this is Wednesday before Thanksgiving. And the record shows that I not only had phone conversations with Ms. Cummings, but also sent her a written response both on Wednesday and on Monday in closing all documents that we had. And the hearing started on Tuesday. Well, the issue I think that she's raising is that some personnel from the Oak Brook police actually spoke with the ISP investigators. So you're saying they had everything, but so they didn't prepare any reports on that issue. That is what Ms. Cummings is alleging. She doesn't. There's nothing to suggest that there was some sort of report that was hidden, destroyed, or anything like that. And I do think that Justice Zinoff makes the point, is that information actually material? Because the whole theory that the chief has in prosecuting this matter is that Steve Peterson was, he was cooperating with the state police after they contacted him. You see, so it really isn't even material evidence that she's trying to go after that somehow Steve Peterson cooperated with the state police. Sure he was cooperating with the state police after they called him and said, by the way, we know you have the guns. Your father confessed to that. We want to get them. And so Steve Peterson cooperated with them. The point that I think the board found and what Judge Sheen found is that his receipt of the guns under the circumstances and the failure to disclose that he had those was a serious problem. Is there ever a point here that, I mean, we're looking at this from one police officer giving it to another police officer and then the ISP officer saying, hey, you're a fellow police officer. Bring him down to the station. We'll honor your request. What about the fact that this is a father and son? Does that mean anything here? Or should it mean anything here? You know what? I think that actually the board's decision, the commission's decision, acknowledges that fact, that his father had placed him in a very difficult position. And I think that the board was willing to say, okay, we get the fact that you took these guns. But once you took them and realized what was going on as the evidence comes rolling in about his father's concern that he'd be arrested, that the media was camping out, that his father was clearly a suspect in the disappearance of Stacy Peterson, at some point he's got the guns that his father doesn't want him to find. He's got this cash. You have to come forward and say, wait a minute, something's not right here. Because you're a police officer? Yes, because you're a police officer. And that really, that point is magnified at the hearing. When I asked Steve Peterson whether after he had a chance to look back if he would do things differently, and he said no. He said, I did nothing wrong. And so he, even with the Monday morning quarterbacking looking back, he was unwilling to admit that that was unwise, that it was foolish, or that it was unlawful in any way. And that was one of the issues that the board and the court actually pointed out below that was problematic with Steve Peterson and one of the issues that justifies the termination. I do want to cover very briefly the discipline issue. Steve Peterson had been an Oak Brook officer for six years, and in that six years he had four suspensions and five reprimands. It really is hardly an exemplary record. And one of the issues that occurred was a very serious issue that occurred after the issue that we're talking about, the 2007 date. And that was his misuse of the leads. That is the background that the police officer has on a computer, in which he clearly misused it. The board found it. The court upheld it. He ran his personal business with respect to his motorcycle, his wife, a family friend, and he threw in the deputy chief and the village manager in checking them out as well. And this was a clear violation. It was a serious violation. And in other contexts, people have been terminated for that sort of a violation. And so it really, when the board said that it was terminating him because the seriousness of the violation of what he had done, the continuing inability to admit the mistake, and the prior discipline. And in this instance, the board found, and we believe that the record sustains, that he clearly was a police officer that Oak Brook could say, this person's not fit to continue as an Oak Brook police officer. In light of the concerns about the deputy chief and the deputy chief coming forward after his retirement or whatever the case may be, was there any explanation from Steven Peterson about why the deputy chief was on this list, the leads list? Did he have some suspicions that he wanted to confirm for purposes of his own hearing? Or did this occur way before his own hearing? The leads issue occurred way before. It occurred a couple years earlier than that, than the 2010 hearing with the deputy chief. So the issue with the receipt of the guns occurred in 2007. And the leads issue occurred after that point in time, about a year or so after that point. I'm trying to remember precisely, but the record would show that in the discipline. I just don't recall. I was the attorney that was involved in that investigation. Based upon this general record and some of the allegations, would it be fair from the city's point of view to say that Mr. Peterson, Mr. Steven Peterson, and the then police chief were not good friends? Let's just say that any time a police chief in any case is looking for the termination of a police officer, there's a feeling of animosity between the two. And this is not any different at all. Every police chief that seeks the termination of an officer, that officer says, that chief is out to get me. Well, the chief is out to get their job because of a particular reason. So I'm not going to suggest that they were buddies. And clearly, the record shows that Ms. Cummings argued and Steve Peterson testified that they believed that the chief was biased against him because he was Drew Peterson's son. That's in the record. So it's not anything that the board didn't hear or couldn't hear that that was argued to the board. But prior to October of 2007, were there any issues between them that should have raised a red flag to look at the chief or maybe some of his positions concerning Steve Peterson? Other than the fact that Steve Peterson had been disciplined by this chief on a prior occasion, I don't know of anything else. And isn't there one thing where he actually tried to not go past the board but not take the matter to the board so it would be more serious? Didn't he try to intervene on Mr. Peterson's behalf prior to the October 2007, or did that occur afterwards? I'm not sure about that question, Your Honor. I will say this, that the record is clear that when Steve Peterson was having trouble with the media and everything, that the department took steps to accommodate him, and he acknowledged that in his testimony. He agreed that the department did try to accommodate him with respect to his scheduling and dealing with the problems of the media and his circumstance. So they did show sympathy to him in that way. I think I've covered the major issues. If you've covered what you want, we did give counsel a little more time, but if you've covered what you want, then. I have covered what I want, and I respectfully request that this court affirm the decision of Judge Sheen, which affirms the board's decision to terminate. Thank you. I briefly want to address the prior lead situation because I think counsel misspoke on one point. That matter, when it went to the circuit court, the circuit court reversed all findings except the findings regarding Steve running his own personal vehicles. Those were the only use of leads the court agreed were inappropriate. His wife is in the process of selling his car, something along those lines, and that's why he ran them. All the other violations were not sustained, which is what led to a settlement of that matter. Again, not appropriate use of leads, but a common use of leads, I have to say, among officers. They check the status of their own vehicles from time to time, so not quite as serious as suggested. The bottom line is we know a lot more today, and we knew a lot more in 2010, than Steve Peterson knew those first four days. There's a couple facts that counsel argued. One, he knew that he was clearly a suspect. He, being Steve, knew his father was clearly a suspect. That's not the case. He knew his dad thought he was going to be arrested. That's an important point because that's a disputed fact. It was heavily disputed at the hearing before the police board. In fact, the police board, at the first instance, never found that Steve Peterson was told by his father he knew he was going to be arrested. That's a crucial point. It was never in any of the documents. Steve denied it. But then the second board put in their report this fact, that Steve Peterson knew that, which was not found in the first place, which is another example of how the second decision really complicates matters and is unfair to Steve. The bottom line is the father and son relationship does have a bearing on this. Under the circumstances and considering the fact that this is his father, in those three to four days, there was nothing that would have triggered in Steve's mind the notion that his father had committed a crime, let alone a heinous crime. As soon as he was aware that the officers were searching his father's house, he disclosed he had the guns. These are two police officers. But he didn't come forward with them. They came to him and said, yes, I have. Yes. And that happened because as they were searching Drew's house, they found a casing or something and said, hey, do you have guns? Yes, where are they? Steve has them. It wasn't some covert. These are two police officers. And I've represented law enforcement officers long enough to say confidently that police officers view the world differently than the rest of us. And they certainly view the handling of weapons differently than the rest of us. Well, what about the fact that Steve Peterson, and I don't mean to call him by his first name out of disrespect, but I want to make sure I'm keeping the two separate, that Steven Peterson received money or checks from Drew Peterson to take care of the kids in case something happened to me. Now, that's true, correct? That's true. In case something happened to me? Yes. Well, what's going to happen to him under this umbrella that we're talking about, the press, the search? Right. What does he expect going to happen to him? And that's an important point because, as you indicated, it's all that the evidence demonstrates. There's no connection between the money and Stacy necessarily or anything like that. His father was overly precautious. Most of this money was in the form of a line of credit. It wasn't a bag of cash or a big check, you know, written under Stacy's name. He gave his son access to his home equity credit line if needed. Parents do that all the time. And you say, again, under the umbrella of the media circus and the search, but that wasn't until after he was given the money. Doesn't that indicate, though, that he knew Stacy Peterson wasn't coming back? He being Drew or he being Steven? Both. Well, I can't ‑‑ I want to speak for Drew Peterson, but Steve, they had a history of serious marital problems. That was in the record. They being Drew and his wife. So not coming back for what reason? Was the idea was to give Steven Peterson this line of credit or the money because she was never coming back or just to hide it in the event of a divorce? It wasn't to hide it. I mean, it isn't either? No, it's neither. Just in case anything happens, I have four children, two by Stacy. I need somebody that I trust to be in charge of them and take care of them. It was that simple. Not their mother? Well, the mother was gone. That's the point. Exactly. But, again, this is two or three days into it. She may or may not be coming back. I don't know. By all indications, at that point, she had just left him for another man and her children. Unless you have any other questions, I have nothing further. Thank you. Thank you very much. Thank you very much for argument today. We do appreciate your time and the effort. We take the matter under advisement. We will issue a decision in due course, and we are now going to stand adjourned.